# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-31123

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2016

Lyle W. Cayce
Clerk

LLOG EXPLORATION COMPANY, L.L.C.,

      Plaintiff - Appellee

v.

SIGNET MARITIME CORPORATION,

      Defendant - Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:14-CV-2791

Before STEWART, Chief Judge, and SMITH and DENNIS, Circuit Judges.

PER CURIAM:*

      Plaintiff-Appellee LLOG Exploration Company, L.L.C. ("LLOG") filed suit against Defendant-Appellant Signet Maritime Corporation ("Signet") in federal district court seeking a declaratory judgment that it did not owe delay damages under the parties' maritime towing contract. The district court granted judgment in favor of LLOG and awarded attorney's fees, costs, and expenses pursuant to the contract. For the following reasons, we affirm the declaratory judgment in favor of LLOG. Because we do not have jurisdiction

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-31123

over the district court's award of attorney's fees, we dismiss Signet's appeal of that issue.

## I. FACTS & PROCEDURAL BACKGROUND

LLOG is a deepwater exploration company headquartered in Covington, Louisiana and Signet is a marine transportation and logistics services company headquartered in Houston, Texas. This case involves a dispute arising out of a contractual towage agreement entered into by Signet and LLOG in 2014. LLOG made arrangements for Signet and Crowley Maritime Services ("Crowley"), to tow its large offshore production facility, DELTA HOUSE ("Delta"), to a worksite in the Gulf of Mexico. Signet was hired to perform the short 17-mile inshore tow of the Delta from the Kiewet Offshore Services shipyard in Ingleside, Texas to the Aransas Pass sea buoy. Crowley was hired for the longer offshore tow of the Delta from the sea buoy to the Gulf of Mexico where the worksite was located.

In January 2014, in making arrangements for the inshore tow, Signet's Manager for Chartering and Business Development, Jason Miura, and LLOG's Offshore Construction Manager, Mark Farrow, began exchanging emails regarding the details of Signet's bid for the tow project. During this time, LLOG was also working with Crowley to finalize the details of the offshore tow. In May 2014, Miura sent an email to Farrow confirming the terms of the parties' agreement as follows: (1) designation of the vessels to be used for the tow; (2) designation of the rates for the tugs to be charged for the tow; (3) a requirement that LLOG provide Signet a minimum of seven days' notice of the sail date for the tow; (4) a requirement that LLOG pay a minimum of four days tug hire after providing notice of sail date; and (5) a requirement that LLOG pay delay charges to Signet if the actual sail date was delayed past the date that LLOG nominated with seven days' notice.

No. 15-31123

The potential delay charges included a "standby rate," to be paid in addition to the four-day minimum tow charge, of 60% of the full charter hire per day until the first day of the actual tow, at which time the full charter hire plus surcharges would recommence pro rata until Signet's vessels returned to its dock. Alternatively, a postponement fee would be assessed as a delay charge, which was calculated as the payment of the four-day minimum tow charge, with the right for LLOG to give seven days' notice of a new, later sail date, subject to the regular applicable charges for the tow services actually rendered.

In July 2014, LLOG accepted Signet's February 2014 bid to provide five tugs for the Delta tow project, subject to the parameters of all pertinent documents and correspondences which, together, encompassed the contract (referred to herein as "the contract") for the project.[1] Prior to the commencement of the tow project, LLOG sent various emails to contacts involved and often included Signet on these correspondences. The dispute arose between the parties as a result of an email LLOG sent on July 15, 2014, to Crowley and multiple other contacts involved in the tow project, *i.e.,* the "tow team," stating in relevant part:

> The tow-out window has been narrowed from August 4th to August 17th with anticipation we will sail at the front end of the window. All tow related activities need to be ready for August 4th. Tabitha has been notified and she will be modifying the channel closure with the USCG accordingly.

---

[1] The pertinent documents comprising the contract included: (1) LLOG's Request for Quote ("RFQ") dated January 2014; (2) Signet's response to LLOG's RFQ dated February 2014; (3) the Blanket Time Charter Agreement dated April 2014; and (4) the May 21, 2014 email from Miura to Farrow confirming the terms of the parties' agreement, including the requirement for seven days' notice of a sail date. Absent from the contract between the parties was a notify "window," which requires a party that hires vessels to give notice of a window of days during which the sail date could occur.

No. 15-31123

Although the email went to numerous contacts involved in the tow project, it did not go to Miura, the Signet manager with whom Farrow had negotiated the inshore tow project. Then on August 6, 2014, Farrow advised the tow team, including Crowley, that the tow window was being revised to the time period from August 29th to September 12th. Crowley responded acknowledging the new tow window and confirming that it would continue to maintain the terms and conditions of its own contract with LLOG.

Miura and Barry Snyder, Signet's CEO and president, contacted Farrow in early August and expressed that Signet had construed the July 15th email as LLOG's declaration of a specific sail date of either August 4th or 14th. Consequently, Signet had prepared to sail for August 4th. Since LLOG was no longer prepared to sail on that date, Signet requested that it sail no later than the last day in the window "as per the postponement fee already agreed." Farrow responded by stating that LLOG's agreement with Signet did not require a notification window, but only seven days' notice of a sail date. He explained that although he had copied some Signet employees and the tow team on the email referencing the tow window declared with Crowley, his doing so was "contractually inconsequential" to Signet, who was never given notice of a sail date or directed to have its own tugs ready at that time.

The parties continued to communicate via email with respect to the purported tow delay and on September 3, 2014, LLOG provided Signet with seven days' notice for a sail date of September 10th. Signet responded to that email and confirmed that its tugs would be ready for the tow on that date. That same day, Signet sent LLOG an invoice for a postponement fee in the amount of $650,496. LLOG refused payment of the invoice. The tow ultimately commenced on September 14th and lasted approximately twelve hours. Because the tow did not commence until four days after the nominated sail

4

date, LLOG paid Signet for the four-day minimum tow charges, plus the charge for the actual day of the inshore tow, which totaled $912,096.

On December 10, 2014, LLOG filed a complaint for declaratory judgment in the United States District Court for the Eastern District of Louisiana seeking a determination of the obligations of the parties under the contract. LLOG's complaint sought a declaration that it did not owe the postponement fee as invoiced by Signet in the amount of $650,496. Signet filed an answer and counterclaim generally denying the allegations of LLOG's complaint and asserting a counterclaim for "standby damages" under the contract in the total amount of $3,322,368—accounting for the days comprising the alleged tow delay from August 4th through September 9th.

After a two-day bench trial, the district court concluded that Signet had failed to carry its burden of proving by a preponderance of the evidence that LLOG had breached the contract. In its findings of fact and conclusions of law, the district court acknowledged that LLOG gave Signet seven days' notice of a sail date on September 3rd, for a final sail date of September 10th. Because the sail actually commenced on September 14th, LLOG paid for five days of the tow as invoiced by Signet ($912,096), the four-day minimum tow charge plus the actual tow, and that was all that was owed under the contract. The district court concluded that LLOG was entitled to declaratory judgment that it did not owe Signet a postponement fee or standby charges under the contract. It further provided that Signet was not entitled to recover under its counterclaim for the postponement fee or standby charges. The district court then ruled that LLOG was entitled as the prevailing party in the litigation to recover attorney's fees, court costs, and other expenses from Signet pursuant to the parties' joint stipulation regarding Paragraph 29 of the contract. The determination of the exact amount of attorney's fees to be awarded to LLOG was bifurcated from the trial as to liability. Signet timely filed this appeal.

No. 15-31123

## II. STANDARD OF REVIEW

"On appeal from a bench trial, we review findings of fact for clear error and legal issues de novo." *Int'l Marine, LLC v. FDT, LLC*, 619 F. App'x 342, 346 (5th Cir. 2015) (citing *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011)).  The interpretation of maritime contract terms is a matter of law that this court reviews de novo.  *Int'l Marine, LLC v. Delta Towing, LLC*, 704 F.3d 350, 354 (5th Cir. 2013) (citing *One Beacon Ins. Co.*, 648 F.3d at 262).  We "review[] for clear error the district court's factual findings as to whether the parties fulfilled their duties under the contract[]." *Ergon–W. Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 (5th Cir. 2013).

## III. DISCUSSION

"When interpreting maritime contracts, federal admiralty law rather than state law applies." *Delta Towing, LLC*, 704 F.3d at 354.  "A maritime contract . . . , whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984). "Disagreement as to the meaning of a contract does not make it ambiguous, nor does uncertainty or lack of clarity in the language chosen by the parties." *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009) (quoting *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 286 (5th Cir. 1997)). "Where 'the written instrument is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous, and [the court] will construe the contract as a matter of law.'" *Breaux*, 562 F.3d at 364 (citation omitted).

Our review of the record evidence and the applicable law indicates that the district court did not clearly err in holding that LLOG did not breach the terms of its contract resulting in an obligation to pay delay damages to Signet. As acknowledged by the district court, the contract between LLOG and Signet

6

was not ambiguous and undisputedly required that LLOG provide seven days' notice of a sail date to Signet. The July 15th email from LLOG to Crowley and the tow team cannot reasonably be interpreted as LLOG's seven days' notice of a sail date to Signet for several reasons. First, the email is addressed from LLOG to the "tow team." Noticeably absent from the recipient list on the email was Miura, the Signet representative with whom LLOG generated and confirmed the terms of the inshore tow contract governing the parties' agreement, including the existence of LLOG's obligation to provide seven days' notice of the sail date. Second, the subsequent emails disseminated by Miura after the July 15th email indicate that he did not believe that a sail date notice had been given at that point, and that he was waiting on a final date to be nominated by LLOG in the future.[2] Additionally, Signet failed to produce evidence at trial that it had actually prepared its tug vessels in anticipation of sailing on August 4th. Third, the email referenced a "tow-out window," a contractual provision agreed upon only by LLOG and Crowley, not LLOG and Signet. Further, as indicated by LLOG and conceded by Signet's president Snyder, the phrase "all tow related activities" referenced in the July 15th email could be interpreted to mean a variety of activities related to the ultimate tow, and not the tow itself. Moreover, the July 15th email does not contain the terms "notice" or "seven days' notice" or even the phrase "sail date." That such phrasing was essential is bolstered by LLOG's subsequent September 3rd email to Signet providing actual seven days' sail date notice, to which Signet promptly responded acknowledging the notice and confirming that its tugs would be ready to sail on September 10th.

---

[2] For example, an email dated July 18th from Miura to Wesley Winchester, another Signet manager stated: "We have [requested] the final tug spread to be nominated when LLOG nominates their final sail away." Miura sent a subsequent email on July 28th similarly indicating that he was waiting on LLOG to nominate a final sail date.

No. 15-31123

Although Signet claims to have interpreted the July 15th email as providing seven days' notice of a sail date, Signet's argument in support of its position is unpersuasive given the plain, unambiguous wording of the parties' contract as well as the plain and unambiguous wording of the email itself.[3] *Weathersby*, 752 F.2d at 955–56 (providing that "whether governed by federal maritime or Louisiana law, [a maritime contract] should be read as a whole and its words given their plain meaning unless the provision is ambiguous."). Accordingly, we uphold the district court's declaratory judgment concluding that LLOG did not breach the terms of the contract and consequently, had no obligation to pay Signet delay damages. *Ergon–W. Va., Inc.*, 706 F.3d at 424.

Finally, as noted by the district court, the parties stipulated in the contract that the prevailing party would be entitled to attorney's fees, court costs, and expenses. However, in its award of fees and costs to LLOG, the district court did not set a set a specific amount. This court held in *S. Travel Club, Inc. v. Carnival Air Lines, Inc.*, 986 F.2d 125, 131 (5th Cir. 1993), "that an order awarding attorney's fees or costs is not reviewable on appeal until the award is reduced to a sum certain." *See also Thornton v. GMC*, 136 F.3d 450, 453 (5th Cir. 1998) ("Normally, an unquantified award of attorney's fees does not constitute a final appealable order pursuant to 28 U.S.C. § 1291."). Because the award of attorney's fees, costs, and expenses to LLOG has not been reduced to a sum certain by the district court, we dismiss Signet's appeal of that issue for lack of jurisdiction. *See South Travel Club, Inc.*, 986 F.2d at 131 (order which had not reduced sanctions to a sum certain not an "appealable final decision"); *Sch. Bd. v. Honeywell, Inc.,* 293 F. App'x 252, 254 (5th Cir. 2008) (where district court did not quantify the amount of an award of

---

[3] This conclusion applies to Signet's argument below that the email constituted notice of an August 4th sail date, as well as its argument on appeal that the email constituted notice of an August 4th sail date or an August 17th sail date, at the latest.

attorney's fees and litigation costs, this Court lacked jurisdiction over the appeal) (citing *Travelers Ins. Co. v. Liljeberg Enters.*, 38 F.3d 1404, 1413 n.18 (5th Cir. 1994)).

## IV. CONCLUSION

For the aforementioned reasons we affirm the district court's declaratory judgment in favor of LLOG.  Because we do not have jurisdiction to review the district court's award of attorney's fees, costs, and expenses, we dismiss without prejudice Signet's appeal of that issue.